**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HONORABLE JANE A. RESTANI, JUDGE**

MITSUBISHI POWER AMERICAS, INC.,

*Plaintiff,*

v.

UNITED STATES,

*Defendant.*

Court No.  **21-cv-00573**

**PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION**
**FOR SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iii

I.      Introduction................................................................................................. 1

II.     The Supported SCR Catalyst Blocks Are Not "Filtering Or Purifying . . . Apparatus, For . . . Gases," Of Heading 8421 ........................................................................... 5

        A.      The Supported SCR Catalyst Blocks Are Not "Apparatus" ................................... 5

        B.      The Supported SCR Catalyst Blocks Neither Filter Nor Purify Gases................ 11

III.    The Supported SCR Catalyst Blocks Are "Reaction Initiators, Reaction Accelerators And Catalytic Preparations, Not Elsewhere Specified Or Included," Of Heading 3815.......... 14

        A.      The "Parts Thereof" Provision of Heading 8421 .................................. 15

        B.      The Supported SCR Catalyst Blocks are *prima facie* classifiable under Heading 3815................................................................................................ 18

        C.      Defendant's Analysis Of The Sequence Of GRI Application in *Home Depot* Is False ........................................................................................... 21

        D.      Under AUSRI 1(c), Heading 3815 "Shall Prevail" Over The "Parts" Provision Of Heading 8421 .............................................................................. 24

        E.      Defendant's Actions After The *Sharp* Decision Demonstrate That Heading 3815 Is Treated As A "Specific" Provision That Would Prevail Over a "Parts" Provision, For Purposes Of Applying AUSRI 1(c) .............................................. 26

IV.     The Supported SCR Catalyst Blocks Qualify For Exclusions From Section 301 Duties. 32

V.      CBP Must Be Equitably Estopped From Denying The Application Of Exclusions From Section 301 Duties To The Supported SCR Catalyst Blocks ........................................... 37

VI.     Alternatively, The Catalyst Elements (Plates) Qualify For Exclusions From Section 301 Duties ........................................................................................ 42

VII.    Conclusion ................................................................................. 43

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Bauerhin Techs. Ltd. Partnership. v. United States*,
110 F.3d 774 (Fed. Cir. 1997)..........................................................................................15

*Continental Automotive Systems, Inc. v. United States*,
589 F.Supp.3d 1215, 1218-1225 (Ct. Int'l Trade 2022) ...............................................9, 10

*Deringer v. United States*,
656 F.Supp. 670, 671 (Ct. Int'l Trade 1986) ............................................................11, 12

*Franklin v. United States*,
289 F.3d 753, 759 (Fed. Cir. 2002)..............................................................11, 12, 13, 14

*Heckler v. Community Health Services*,
467 U.S. 51, 59 (1984).....................................................................................................39

*Home Depot U.S.A., Inc. v. United States*,
915 F.3d 1374 (Fed. Cir. 2019)..................................................................................21, 22

*Jarvis Clark Co. v. United States*,
733 F.2d 873, 878 (Fed. Cir. 1984)..................................................................................15

*JVC Co. of Am. v. United States*,
234 F.3d 1348 (Fed. Cir. 2000)........................................................................................23

*Keystone Automotive Operations, Inc. v. United States*,
732 F.Supp.3d 1339, 1350 (Ct. Int'l Trade 2024) ...........................................4, 35, 38, 39

*Masters Pharmaceutical, Inc. v. DEA*,
871 F.3d 206, 225 (D.C. Cir. 2017)..................................................................................39

*Noss Co. v. United States*,
588 F.Supp. 1408, 1412 (Ct. Int'l Trade 1984)
(aff'd, 753 F.2d 1052 (Fed. Cir. 1985)) .....................................................................11, 12

*Orlando Food Corp. v. United States*,
140 F.3d 1437 (Fed. Cir. 1998)........................................................................................20

*Rollerblade, Inc. v. United States*,
282 F.3d 1349, 1353 (Fed. Cir. 2002)..............................................................................15

*Russ Berrie & Co. v. United State*s,
329 F. Supp. 3d 1345, 1375-76 (Ct. Int'l Trade 2018)......................................................24

*Sharp Microelectronics Tech. v. United States*,
122 F.3d 1446 (Fed. Cir. 1997)................................................................. *passim*

*Trijicon, Inc. v. United States*,
686 F.Supp.3d 1336 (Ct. Int'l Trade 2024) ......................................5, 6, 7, 8, 9

*United States v. Hanrahan*,
45 C.C.P.A. 120 (1958) .........................................................................20

*United States v. Pompeo*,
43 C.C.P.A. 9, 14 (1955) .......................................................................15

*United States v. Willoughby Camera Stores, Inc.*,
21 C.C.P.A. 322, 324 (1933) ..................................................................15

*Zacharin v. United States*,
213 F.3d 1366, 1371 (Fed. Cir. 2000)......................................................39

## Statutes

19 U.S.C. §§ 1514(a) and 1515................................................................38

28 U.S.C. § 1581(a) ...............................................................................38

Harmonized Tariff Schedule of the United States

    Additional U.S. Rule of Interpretation 1(c) ....................................... *passim*

    General Rule of Interpretation 1 .......................................................3, 21

    General Rule of Interpretation 2(b).........................................................23

    General Rule of Interpretation 3 ......................................................21, 24

    General Rule of Interpretation 3(b)...............................................3, 22, 24

    Heading 3815 ........................................................................... *passim*

    Heading 3926 ......................................................................30, 31

    Heading 8301 ......................................................................21, 22

    Heading 8302 ......................................................................21, 22

    Heading 8414 ...............................................................................28

Heading 8421 ........................................................................................ *passim*

Heading 8452 ..................................................................................27, 28

Heading 8473 ......................................................................................26

Heading 8479 ..................................................................................29, 30

Heading 8517 ......................................................................................29

Heading 8529 ..................................................................................30, 31

Heading 9013 ........................................................................25, 26, 27, 29

Heading 9027 ..................................................................................29, 30

Heading 9405 ..................................................................................27, 28

Heading 9903.88.46 .........................................................................32, 43

Heading 9903.88.56 .........................................................................32, 43

Subheading 3815.19.0000 .................................................................4, 43

## Other Authorities

USCIT Rule 56 ...........................................................................................1

Customs Bulletin (Volume 39, Number 40, November 23, 2005) ...................30

Headquarters Ruling Letter 966041.............................................................27, 28

Headquarters Ruling Letter 967388.............................................................29

Headquarters Ruling Letter 967549.............................................................29

Headquarters Ruling Letter H027028 ..........................................................16

Headquarters Ruling Letter H071775 ..........................................................28

Headquarters Ruling Letter H238494 ..........................................................16

Headquarters Ruling Letter H255093 .................................................................16

Headquarters Ruling Letter H285929 .................................................................30

Headquarters Ruling Letter W967842 ................................................................29

*Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Targeting of the Semiconductor Industry for Dominance, 89 Fed. Reg. 106725 (Dec. 30, 2024)* ....................................................42

Merriam Webster Online Dictionary .................................................................5

Webster's New World Dictionary ..............................................................15, 16

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HONORABLE JANE A. RESTANI, JUDGE**

MITSUBISHI POWER AMERICAS, INC.,

                              *Plaintiff,*

         v.

UNITED STATES,

                              *Defendant.*

Court No. **21-cv-00573**

**PLAINTIFF'S MEMORANDUM IN RESPONSE TO DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Mitsubishi Power Americas, Inc., ("Mitsubishi" or "Plaintiff") submits this response/reply memorandum in opposition to Defendant's, United States' ("Defendant" or "Government") cross-motion for summary judgment and in support of Plaintiff's motion for summary judgment. Plaintiff has demonstrated that no genuine dispute exists as to any material fact that requires trial of this test case within the meaning of U.S. Court of International Trade ("USCIT") Rule 56. Most importantly, the parties agree as to the contents of the Supported SCR Catalyst Blocks (also referred to as the "Subject Merchandise")—consisting overwhelmingly of the catalyst elements (plates)—and what chemical reactions occur within the Supported SCR Catalyst Blocks. Defendant proffered nothing to dispute the expert report of Dr. Scott Hinton, who holds a B.S. in Chemical Engineering and a Ph.D. in Heterogeneous Catalysis, and who explains that those reactions are neither "filtration" nor "purification" reactions. This dispute is therefore a matter of legal interpretation, which should be resolved through summary judgment.

## I.    Introduction

Defendant completely misunderstands, and thus misrepresents, the purpose, function, and contents of the Supported SCR Catalyst Blocks. In its combined cross-motion and opposition to

Plaintiff's motion for summary judgment ("Def. Brief"), Defendant claims that "[t]he blocks are apparatus—which is commonly defined as a set of equipment or complex device for performing a particular function." Def. Brief at 13. Defendant also claims that the blocks "filter or purify flue gas by catalytically converting pollutants into less harmful substances." *Id*. This is fundamentally incorrect as more fully explained *infra*, and is refuted based on dictionary definitions, case law adopted by this Court, and expert testimony of Dr. Scott Hinton, who holds a B.S. in Chemical Engineering and a Ph.D. in Heterogeneous Catalysis. Most importantly, the Subject Merchandise consists predominantly of catalyst elements (plates), with approximately thirteen hundred (1,300) catalyst elements (plates) making up each Supported SCR Catalyst Block. Other components— such as the block frame, protector, seal bars, seal plate, and, depending on the application, spacers—are miscellaneous components that simply make it easier to install the catalyst elements (plates) into an SCR system. These parts provide no independent functionality on their own. Dr. Hinton explained in detail that chemical reactions occurring within the supported catalyst elements (plates) of the Supported SCR Catalyst Blocks are not "filtration" or "purification" reactions, and are not affected by these miscellaneous components.

Additionally, Defendant misrepresents Plaintiff's argument by stating that "Mitsubishi challenges this classification [under Heading 8421], arguing that the blocks do not physically extract substances from gas." *Id*. at 13-14. Defendant's statement presupposes that this is the only disagreement that Plaintiff has with the Government. However, Plaintiff challenged the applicability of the entire Heading 8421, Harmonized Tariff Schedule of the United States ("HTSUS"), which provides for "[c]entrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases; parts thereof." Plaintiff's Motion for Summary Judgment (ECF No. 55) ("Pl. Brief") at 29-34. As such, Plaintiff's position, as clearly established

in Plaintiff's Motion for Summary Judgment, is that the Supported SCR Catalyst Blocks are neither centrifuges, centrifugal dryers, filtering or purifying machinery and apparatus, for liquids or gases, nor parts thereof.

Next, Defendant claims that "Mitsubishi's arguments in favor of this provision are legally flawed as it misapplies the sequential order of the General Rules of Interpretation ('GRIs') of the tariff code." Def. Brief at 14. This argument also fails because as shown in more detail *infra*, the Supported SCR Catalyst Blocks are *prima facie* classifiable under Heading 3815, HTSUS, which provides for "[r]eaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included." This HTSUS Heading is determinable pursuant to GRI 1, because the Supported SCR Catalyst Blocks in whole are not prohibited from being considered "preparations"; the miscellaneous structural components do not affect the ability of the catalyst elements (plates) to initiate and accelerate reactions, and simply make it easier to install the catalyst elements (plates) into an SCR system. Alternatively, if this Court disagrees that GRI 1 would apply, the Subject Merchandise is still properly classified in Heading 3815 by application of GRI 3(b). This is because the catalyst elements (plates) of Heading 3815 predominate over any miscellaneous structural components, and the catalyst elements (plates) impart the "essential character" of the Supported SCR Catalyst Blocks.

If this Court concludes that the Supported SCR Catalyst Blocks are not "apparatus" under Heading 8421, but decides to compare the provision of Heading 3815 to the "parts thereof" provision of Heading 8421, this comparison would be guided by Additional U.S. Rule of Interpretation ("AUSRI") 1(c), which states that the specific provision of Heading 3815 shall prevail over the "parts" provision of Heading 8421. This conclusion would also be based on GRI 1, and ample precedent exists to show that Defendant does not consider the language "not

elsewhere specified or included" in a heading as fatal to that heading's consideration as a "specific" provision for purposes of AUSRI 1(c). As explained *infra*, Defendant is mistaken that Heading 3815 is a "basket provision" that automatically disqualifies it from consideration.

Defendant also claims that "no Section 301 exclusions apply to the SCR catalyst blocks." Def. Brief at 14. This is patently false, because the Supported SCR Catalyst Blocks are clearly described by the terms of the exclusions issued to Plaintiff by the United States Trade Representative ("USTR") upon Plaintiff's request. Defendant is also wrong when it contends that the original exclusion request is irrelevant to the interpretation of the exclusion. This Court has clearly established that the underlying exclusion request, which in this case clearly describes supported SCR catalysts imported in block form, is relevant when determining the applicability of the exclusion. *See Keystone Automotive Operations, Inc. v. United States*, 732 F. Supp. 3d 1339, 1350 (Ct. Int'l Trade 2024).

Finally, Defendant must be equitably estopped from denying the application of the exclusions to the Supported SCR Catalyst Blocks, because the Government has already approved such exclusions for the Subject Merchandise when the USTR together with the United States Customs and Border Protection ("CBP") granted the exclusions and all elements of equitable estoppel against the Government are met.

At a minimum, because Defendant conceded that the exclusions apply to the SCR catalyst elements (plates) in that the SCR catalyst elements (plates) meet the description of the exclusions and are classified under subheading 3815.19.0000, HTSUS, this Court must follow Defendant's logic and apply the exclusions to the value of the SCR catalyst elements (plates).

**II.     The Supported SCR Catalyst Blocks Are Not "Filtering Or Purifying . . . Apparatus, For . . . Gases," Of Heading 8421**

The Supported SCR Catalyst Blocks cannot be classified under Heading 8421, HTSUS, which provides for, among other things, "filtering or purifying . . . apparatus, for . . . gases." As explained in more detail *infra*, the Supported SCR Catalyst Blocks are not "apparatus," because they are neither a set of materials or equipment designed specifically to carry out a particular function nor a complex device or machine for a specific use. Also, the Supported SCR Catalyst Blocks neither "filter" nor "purify" gases; they simply convert nitrogen oxides into nitrogen and water vapor to prepare the flue gas for further processing and filtration within the Air Quality Control System ("AQCS"). As such, the Supported SCR Catalyst Blocks do not meet the criteria to be classified under Heading 8421, HTSUS, as "filtering or purifying . . . apparatus, for . . . gases."

**A.     The Supported SCR Catalyst Blocks Are Not "Apparatus"**

Defendant mistakenly argues throughout its brief that the Supported SCR Catalyst Blocks are "apparatus." Specifically, Defendant misinterprets this Court's reading and interpretation of the term "apparatus". Defendant proffers the definition of "apparatus" as provided by Merriam-Webster online dictionary: "a set of materials or equipment designed for a particular use." *Apparatus*,                    MERRIAM-WEBSTER.COM,                    https://www.merriam-webster.com/dictionary/apparatus (last visited Jan. 11, 2025); Def. Brief at 16. However, this Court has interpreted the term "apparatus" in two ways. As explained in the case *Trijicon, Inc. v. United States*, 686 F.Supp.3d 1336 (Ct. Int'l Trade 2024), Defendant's interpretation of this term in its brief misconstrues both of the interpretations.

Defendant presumes that this Court in *Trijicon* "defined the term [apparatus] as 'equipment designed specifically to carry out a particular function' or 'any complex device or machine for a

specific use.'" Def. Brief at 16. Defendant appears to misreport the first definition, because this Court in *Trijicon* more accurately described the first definition as "**a set of materials or** equipment for a particular use." *Trijicon*, 686 F.Supp.3d at 1343. Defendant also completely ignores the Court's reference to the second definition raised in *Trijicon*. More importantly, Defendant's attempt to rely on *Trijicon* is puzzling because the Court's decision in this case favors Plaintiff's position, not Defendant's. Specifically, to the extent that *Trijicon* involved the question of whether the subject merchandise in that case was to be classified as an "apparatus," this Court held that "any difference between those two definitions . . . is inconsequential because the subject imports [did] not meet either definition." *Trijicon*, 686 F.Supp.3d at 1344.

Defendant fails to offer any evidence that the Supported SCR Catalyst Blocks meet the first definition: a set of materials or equipment. For good reason, it is clear that the Supported SCR Catalyst Blocks do not meet the criteria for a "set of materials or equipment." As to this definition, this Court explained as follows in *Trijicon*:

> Equipment means a "set of articles or physical resources serving to equip" something and is *also, circularly for these purposes, known as an "apparatus."* Equipment, Merriam-Webster's Collegiate Dictionary (11th ed. 2018). Nevertheless, *each individual component of the subject imports must also serve a particular function*. While the subject imports each contain, at least, three components […], none of those constituent parts constitutes equipment because no part, alone, serves a particular function. As discussed below, it is only in combination with the other constituent parts that they serve the intended function of providing illumination. Thus, the existence of the constituent parts is insufficient insofar as "apparatus" means "a collection of equipment." *Apparatus*, COLLINS ENGLISH DICTIONARY (1st ed. 2016). (Emphasis added.)

*Id*. at 1344-45. Like in *Trijicon*, here, none of the miscellaneous components such as the block frame, protector, seal bars, seal plate, and, depending on the application, spacers serves a particular function. It is only the SCR catalyst elements that serve the intended function of initiating and accelerating chemical reactions within the Supported SCR Catalyst Blocks. Thus, the mere

existence of the miscellaneous components—with only SCR catalyst elements performing the intended function of the Supported SCR Catalyst Blocks—is insufficient to raise the Supported SCR Catalyst Blocks to meet the definition of "apparatus" as "a collection of equipment."

As to the second definition of "apparatus"—a complex device—Defendant summarily and wrongly concludes that *Trijicon* supports a finding that the Supported SCR Catalyst Blocks meet this definition of "apparatus." Specifically, Defendant states as follows:

> The blocks' components are not just a few "easily . . . disentangled" materials that have been "coordinated", *see Trijicon*, 686 F.Supp.3d at 1345 (providing the definition of a complex device as consisting "of parts or elements not simply co-ordinated, but some of them involved in various degrees of subordination; complicated, involved, intricate; or not easily analysed or disentangled") (internal citation omitted), but rather they comprise an "intricate" (686 F.Supp.3d at 1345) array of physical structures and synthesized chemical preparations specially designed to filter or purify flue gas.

Def. Brief at 17. However, Defendant falls short of explaining ***why*** the Supported SCR Catalyst Block's miscellaneous components (the block frame, protector, seal bars, seal plate, and spacers) (*see* Plaintiff's Statement of Undisputed Material Facts, ECF No. 55-2, ("Pl. SOF") 14-18) are not just a few easily disentangled materials or are not simply coordinated. Defendant gives no explanation as to how these components are involved in various degrees of subordination. Defendant also offers nary a word on how these components are complicated, involved, intricate, or not easily analyzed or disentangled. This is because there are no reasonable explanations to offer; Defendant could not possibly explain and establish any of the above to show that Supported SCR Catalyst Blocks are "apparatus."

Importantly, Defendant concedes in its Statement of Material Facts As To Which There Are No Genuine Issues To Be Tried, ECF No. 64-1, ("Def. SOF") that components of the Supported "SCR Catalyst Blocks are distinguishable and are not part of the supported SCR catalyst." Def. SOF 28. As such, by Defendant's own admission, components of the Supported

SCR Catalyst Blocks are simply coordinated, and they are not involved in various degrees of subordination. They are neither complicated, involved, nor intricate. Most importantly, and again by Defendant's own admission, components of the Supported SCR Catalyst Blocks are easily analyzed or disentangled (*i.e.*, "distinguishable").

Further, Defendant fails to address this Court's broader discussion in *Trijicon* as to what is considered "a complex device" and why the article in that case did not meet that definition. Specifically, this Court explained as follows:

> "Complex" is commonly defined as "[c]onsisting of parts or elements ***not simply co-ordinated, but some of them involved in various degrees of subordination***"; "complicated, involved, intricate"; or "not easily analysed or disentangled." Pl.'s Ex. 21, ECF No. 36-4 (definition from the online version of *The Oxford English Dictionary*). The court can readily discern the separate elements of the subject imports: the glass capillary, the phosphor coating, and the tritium gas. However, as just discussed, these elements must work together to create illumination—if any element were removed, the illumination could not be effectively created and directed. ***Each element remains distinct and able to be disentangled from the others, and no element is subordinate to the others. Instead, all three elements must be coordinated, and this coordinated functioning is not sufficient to establish complexity.*** Despite the scientific nature of this manner of producing illumination, and the inclusion of beta radiation, it is a natural phenomenon created by the coordination of different component parts. Trijicon's assertion of a "complex production process" to manufacture the subject imports, Pl.'s Resp. at 21, is inapposite: the question is whether the device is complex, not whether the process of creating the device is complex. Here, the subject imports are not complex devices…

*Trijicon*, 686 F.Supp.3d at 1345 (emphasis added).

Just as in *Trijicon*, here, the Court and the parties should be able to "readily discern the separate elements of the subject imports": catalyst plates (elements), catalyst units, block frame, protector, a set of seal bars, a seal plate, and spacers. Pl. SOF 14-18. Also as in *Trijicon*, each element of the Supported SCR Catalyst Block here remains distinct (*i.e.*, "distinguishable") (*see* Def. SOF 28) and able to be disentangled from the others, and no element is subordinate to the others—meaning that catalyst elements (plates) can function as intended without the other

structural components. The same reasoning—coordinated functioning is not sufficient to establish complexity—applies in this case, only here, the elements of the Supported SCR Catalyst Block do not even rise to the level of "coordination." The SCR catalyst elements are the active materials that provide functionality, and the remaining miscellaneous components simply provide passive structure and ease of installation. This confirms that the Supported SCR Catalyst Blocks are not "complex devices," and, thus, not "apparatus." Even if assumed, *arguendo*, that all components of the Supported SCR Catalyst Blocks must be coordinated, that coordinated functioning—as held in *Trijicon*—is not sufficient to establish complexity. As such, following the reasoning in *Trijicon*, here, the Supported SCR Catalyst Block are not "complex devices," and, thus, not "apparatus."

Defendant also relies on *Continental Automotive Systems, Inc. v. United States*, 589 F.Supp.3d 1215, 1218-1225 (Ct. Int'l Trade 2022) (holding that the imported NOx Sensor Probes, commonly used in a selective catalytic reduction system to condition a vehicle's exhaust gas to remove pollutants, were gas or smoke analysis apparatus). Def. Brief at 16-17. Defendant appears to draw the connection between this case and the definition of "apparatus" discussed in *Trijicon*. No such connection exists. In fact, in *Continental Automotive Systems* this Court did not discuss the definition of "apparatus" at all. As such, this case is irrelevant to the analysis here.

The only thing that tangentially connects *Continental Automotive Systems* with the case at hand is a discussion of "selective catalytic reduction systems" in vehicles. *Continental Automotive Systems*, 589 F.Supp.3d at 1218-1219. In its brief, Defendant appears to analogize "a car's catalytic converter" to the Supported SCR Catalyst Blocks. Def. Brief at 16. However, Defendant later totally abandons this analogy:

> [A]t the eight-digit level, although the blocks purify exhaust gas through catalytic conversion, the blocks themselves are not "catalytic converters" of Subheading 8421.39.40 as that phrase is commonly understood, because a catalytic converter is

"an *automobile* exhaust-system component," […] not a flue-gas purifying component for plants as the blocks are.

Def. Brief at 22.

Furthermore, neither the Supported SCR Catalyst Blocks imported by Mitsubishi, nor the SCR reactor (SCR system) as a whole, act as catalytic converters. Pl. SOF 73. The Supported SCR Catalyst Blocks, by themselves, do not have the components necessary to perform filtration or purification. Pl. SOF 14-18, 41, 73. This is in contrast to a catalytic converter in a vehicle, which has all necessary capabilities in a self-contained housing to reduce the presence of toxic compounds from the exhaust of an automobile combustion engine. Pl. Exhibit ("Ex.") 2 at 4. As noted in Dr. Hinton's expert report, a catalytic converter contains, in addition to the catalyst: inlet/outlet manifolds, heat shields, a converter body, and provisions for oxygen sensors. Pl. Ex. 2 at 4, 39. It is, in other words, a complete stand-alone device, needing only to be installed into the exhaust of an automobile to function as intended. Pl. Ex. 2 at 4. The Supported SCR Catalyst Blocks are not stand-alone devices, as further discussed *infra*. Given this, the Supported SCR Catalyst Blocks cannot be considered analogous to a catalytic converter, and Defendant's reliance on the automotive catalytic converter discussion in *Continental Automotive Systems* is thus misplaced.

Finally, Defendant contends that "Mitsubishi does not challenge that the blocks are considered apparatus." Def. Brief at 17. This is patently false. Plaintiff challenged the applicability of the entire Heading 8421, HTSUS, which provides for "[c]entrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases; parts thereof." Pl. Brief at 29-34. As such, Plaintiff's position, as clearly established in Plaintiff's Motion for Summary Judgment, is that the Supported SCR Catalyst Blocks are neither centrifuges, centrifugal dryers, filtering or purifying machinery and apparatus, for liquids or gases, nor parts thereof.

Because the Supported SCR Catalyst Blocks are neither "a set of materials or equipment for a particular use" nor "complex devices," they are not "apparatus" of Heading 8421, HTSUS.

**B.    The Supported SCR Catalyst Blocks Neither Filter Nor Purify Gases**

The Supported SCR Catalyst Blocks are not described by the common or dictionary definitions of the terms "filter" or "purify," and they do not fall under this Court's interpretation of these terms. Defendant appears to concede that the Supported SCR Catalyst Blocks do not function to filter gases. Even though Defendant suggests that the terms "purify" and "filter" can be used synonymously (see Def. Brief at 18), Defendant focuses on how the term "purify" is defined and applied (see Def. Brief at 19-22).

As to the term "purify," in all three cases relied upon by Defendant—*Franklin v. United States*, 289 F.3d 753, 759 (Fed. Cir. 2002); *Noss Co. v. United States*, 588 F.Supp. 1408, 1412 (Ct. Int'l Trade 1984) (aff'd, 753 F.2d 1052 (Fed. Cir. 1985)), and *Deringer v. United States*, 656 F.Supp. 670, 671 (Ct. Int'l Trade 1986)—this Court and the United States Court of Appeals for the Federal Circuit ("CAFC") confirmed that for an article to function as a purifier, it must "***remove***" or "***eliminate***" unwanted constituents from a substance. (Emphasis added.) Defendant claims "[t]hat is precisely the function of the SCR catalyst blocks." Def. Brief at 18. Defendant further explains "[t]hey catalytically ***convert*** unwanted or undesirable nitrogen oxides and elemental mercury in flue gas, replacing them with nitrogen, water, and oxidized mercury." Def. Brief at 18 (emphasis added). However, the major fallacy in Defendant's argument is that "conversion" does not constitute "removal" or "elimination"—the functions that both this Court and the CAFC have determined are required to conclude that an article functions as a purifier.

Specifically, Supported SCR Catalyst Blocks facilitate the reaction of ammonia ($NH_3$) with nitrogen oxides (NO and $NO_2$, collectively referred to as $NO_X$). Pl. SOF 23-26. The reaction

11

proceeds as a reduction reaction whereby ammonia ($NH_3$) reacts with nitrogen oxides ($NO_X$) and oxygen ($O_2$) and converts nitrogen oxides ($NO_X$) into nitrogen ($N_2$) and water vapor ($H_2O$)." *Id*. This is undisputed and agreed upon by both parties.

Dr. Hinton, who holds a B.S. in Chemical Engineering and a Ph.D. in Heterogeneous Catalysis, explains in his unrefuted expert report that this is "a balanced chemical reaction, in which no mass is gained or lost as part of the process." Pl. Ex. 2, at 3. "[A]ll atoms that were present prior to the reaction remain after the reaction." *Id*. at 15. "The $NO_X$ molecule has simply been converted to other molecules (nitrogen and water)." *Id*. "Furthermore, the treated flue gas would not be considered 'pure,' even after treatment, as it still contains numerous contaminants, including $NO_X$." *Id*. at 4. Dr. Hinton concluded that chemical reactions occurring within Supported SCR Catalyst Blocks are not filtration or purification reactions. Pl. Ex. 3, at 145:23–147:4. As such, the chemical processes occurring within the Supported SCR Catalyst Blocks are completely different from those occurring with articles involved in *Franklin*, *Noss*, and *Deringer*.

In *Franklin*, imported coral sand packets "add[ed] calcium and magnesium ions to the water," which "increase[d] the water's pH, rendering it more alkaline or 'hardening' it" thereby "kill[ing] bacteria in the water" and eliminating "chlorine." *Franklin*, 289 F.3d at 760. *Noss* focused on "Radiclone [which] is a device that aids in removing contaminants from pulp and paper stock." *Noss Co.*, 588 F.Supp. at 1410. "Most of the larger and heavier of the remaining contaminants are removed by use of the Radiclone." *Id*. Finally, in *Deringer*, this Court discussed reverse osmosis maple sap concentrators that removed excess water from maple sap. *Deringer*, 656 F.Supp. at 671. As such, each of those cases involved actual removal. Moreover, most of the discussion in those cases seems to focus around whether the substance being removed was an "unwanted constituent" or "impurity." Put differently, it was undisputed that *something* was being

removed in each of these cases, but it was unclear how to describe *what* was being removed. Here, in contrast, nothing is being killed, eliminated, or removed by the Supported SCR Catalyst Blocks. The Supported SCR Catalyst Blocks simply facilitate the conversion of nitrogen oxides into nitrogen and water vapor in the presence of ammonia and oxygen, which—as explained by Dr. Hinton—is neither filtration nor purification.

Even though this has been explained in detail in Plaintiff's brief in support of its motion for summary judgment (*see* Pl. Brief at 29-34), Defendant incorrectly claims that "Mitsubishi's sole argument against classification under Heading 8421 is that its SCR catalyst blocks do not 'remove' anything from flue gas." Def. Brief at 19. Defendant's brief further incorrectly states that we interpret the definition of "purify" "as somehow requiring a physical removal of mass from a substance, when nothing in that definition establishes that limitation." *Id.*

Plaintiff understands that the term "purify" includes both physical and chemical elimination or removal of unwanted constituents. However, the Supported SCR Catalyst Blocks do not "filter" or "purify" (*i.e.*, do not eliminate or remove unwanted constituents) gases either chemically or physically. Defendant appears to focus on chemical purification. Def. Brief at 19. Dr. Hinton has clearly confirmed that the Supported SCR Catalyst Blocks do not act like chemical filters or purifiers. Pl. Ex. 3, 155:24-156:4 (Q: Now, are the imported catalyst – SCR catalyst blocks, are they chemical filters? A: No, they are not. Q: Are they imported SCR catalyst block chemical purifiers? A: No.). As such, the Supported SCR Catalyst Blocks are neither chemical filters nor chemical purifiers.

In its brief, Defendant also impermissibly broadens and mischaracterizes the CAFC's findings in *Franklin*. Specifically, Defendant writes as follows:

> Moreover, as the court in *Franklin* explains, and the Explanatory Note confirms, purification can occur through a chemical reaction that converts something

13

> unwanted into something innocuous—not just through physical extraction that puts
> an undesirable substance somewhere else.

Def. Brief at 19. This is an impermissibly broad reading and mischaracterization, because neither the CAFC in *Franklin* nor the Explanatory Notes discuss a chemical reaction of conversion or conclude that conversion is the same as "purification" or "filtration." The CAFC in *Franklin* discussed actual removal (*i.e.*, killing of bacteria and eliminating chlorine), which—unlike conversion—constitutes purification. As such, Defendant broadens and mischaracterizes this Court's and the CAFC's definition of purification adopted in *Franklin*.

Finally, Defendant claims that Dr. Hinton's expert report "has little probative value" because "[t]he report's conclusions are based on erroneous legal analysis of tariff terms and the Explanatory Notes, rather than scientific method or experience." Def. Brief at 20-21. While Dr. Hinton referred to the HTSUS and Explanatory Notes, this was merely done to show diligence and to indicate what terms Dr. Hinton was analyzing from a scientific standpoint. The length of the report is explained by the various examples and analysis that have been provided by Dr. Hinton to lay out scientifically why the Supported SCR Catalyst Blocks are neither filters nor purifiers.

As such, as explained in detail above, the Supported SCR Catalyst Blocks cannot be classified under Heading 8421, HTSUS, because they are not "filtering or purifying . . . apparatus, for . . . gases."

### III.    The Supported SCR Catalyst Blocks Are "Reaction Initiators, Reaction Accelerators And Catalytic Preparations, Not Elsewhere Specified Or Included," Of Heading 3815

As discussed in Section II(A), *supra*, Mitsubishi's position is that the Supported SCR Catalyst Blocks are not used for filtration or purification and are not described as an "apparatus" as the term is used in Heading 8421, HTSUS. The Supported SCR Catalyst Blocks are also clearly not centrifuges or centrifugal dryers, and Defendant appears to have waived any argument in its

14

brief that the Subject Merchandise constitutes "machinery." The remaining provision described in Heading 8421, HTSUS, covers "parts" of filtering or purifying machinery and apparatus. Even if, for the sake of argument, the Subject Merchandise falls under the "parts" provision of Heading 8421, HTSUS, such a "parts" provision cannot prevail over Heading 3815, HTSUS.

A.    The "Parts Thereof" Provision of Heading 8421

To be clear, Mitsubishi is not advocating that this Court find that the Supported SCR Catalyst Blocks be classified as "parts" of filtering or purifying machinery and apparatus. However, it does recognize that the Court bears the responsibility for determining the correct tariff classification of the Supported SCR Catalyst Blocks. *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984). This includes instances where the Court considers HTSUS provisions that are not affirmatively raised by the parties themselves.

In *Bauerhin Techs. Ltd. Partnership. v. United States*, 110 F.3d 774 (Fed. Cir. 1997), the CAFC identified two distinct lines of cases that aim to define the word "part." *Id.* at 778-779. One line of cases stems from *United States v. Willoughby Camera Stores, Inc.*, 21 C.C.P.A. 322, 324 (1933), which held that a part of an article "is something necessary to the completion of that article . . . without which the article to which it is to be joined, could not function as such article." The second line of cases evolved from *United States v. Pompeo*, 43 C.C.P.A. 9, 14 (1955), which held that something may be a "part" of an article, even if its use is optional and the article will function without it, if the part is dedicated for use within the article, and, once installed, the article will not operate without it.

The definition of "parts" was also discussed in *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1353 (Fed. Cir. 2002), in which the CAFC defined a part as "an essential element or constituent; integral portion which can be separated, replaced, etc." *Id.*at 1353 (citing *Webster's*

15

*New World Dictionary* 984 (3d College Ed. 1988)). CBP has developed a practice of applying the rationales from the above lines of cases in many of its tariff classification rulings. *See e.g.*, Headquarters Ruling Letter ("HRL") H255093, dated January 14, 2015; HRL H238494, dated June 26, 2014; HRL H027028, dated August 19, 2008.

Defendant did not raise the argument that the Supported SCR Catalyst Blocks may be "parts" of filtering or purifying machinery or apparatus in its brief. In fact, Defendant went so far as to say that the Supported SCR Catalyst Blocks are ***not*** "parts thereof" that would be classified under subheadings 8421.91 through 8421.99. Def. Brief at 21. This is a confusing assertion, as much of Defendant's Statement of Facts in its brief is otherwise spent describing how the Supported SCR Catalyst Blocks function only as a ***part*** of an SCR system—based on the rationale applied from the above lines of cases—where the SCR system itself operates as a ***part*** of a larger Air Quality Control System (AQCS):

- In Defendant's Statement of Facts, it alleges that the way the SCR catalyst blocks are allegedly "used to reduce nitrogen oxide and elemental mercury emissions from flue gas" is "by ***incorporating*** SCR catalyst blocks into SCR systems." Def. Brief at 7; Def. SOF ¶¶ 39, 60 (emphasis added). The Supported SCR Catalyst Blocks, to rephrase Defendant, act as the "essential element or constituent" of an SCR system.

- As alleged by Defendant, the catalyst elements must be installed into an SCR system in order for them to adequately perform the function of catalyzing nitrogen oxides and mercury contained in flue gas. An SCR system requires the installation of "hundreds of SCR catalyst blocks," or put differently, many thousands of SCR catalyst elements, for them to work. *See* Def. Brief at 8; Def. SOF ¶ 40.

- An SCR system, as Defendant notes, is comprised of, among other components, "an inlet duct, an ammonia injection system, a mixing system, and SCR reactor (which . . . houses the SCR catalyst blocks), and an outlet duct." Def. Brief at 8; Def. SOF ¶ 34.

- Defendant states that "[t]he SCR catalyst blocks' active chemical compounds catalyze the reaction of nitrogen oxides present in flue gas . . . with ammonia ($NH_3$) in the presence of oxygen to convert the nitrogen oxides into nitrogen and water." Def. Brief at 6; Def. SOF ¶¶ 16, 29. While oxygen may be abundantly present in the atmosphere to allow for catalyzation to take place in an open environment, ammonia is not. For the Supported SCR Catalyst Blocks to perform the desired catalytic chemical reactions, ammonia must be introduced into the SCR system.

- Defendant further explains that an SCR system operates by having "the flue gas to be treated enter[] through an inlet duct. . . . An ammonia injection grid then sprays ammonia into the flue gas and a mixing system mixes the ammonia and nitrogen oxides together." Def. Brief at 9; Def. SOF ¶¶ 36, 37. Only then is the flue gas directed through the SCR catalyst elements, which can catalyze the nitrogen oxides *with* the ammonia into nitrogen gas and water.

- Defendant states outright that "SCR systems are in turn used *as components* of larger air quality control systems (AQCSs), which is a term used to describe the suite of air quality controls for a given operating unit and captures the collection of systems related to the control of regulated constituents." Def. Brief at 10; Def. SOF ¶ 60. Within an AQCS, it alleges (incorrectly) that "[t]he SCR *system* . . . reduces the amount of nitrogen oxides in flue gas by converting it to nitrogen and water." *Id.*[1]

By Defendant's own explanations above, the Supported SCR Catalyst Blocks cannot perform the process of catalyzation unless they have been incorporated into an SCR system that *also includes*, among other system components, the ammonia injection grid and the mixing system. Mitsubishi has long taken the position that none of the Supported SCR Catalyst chemical reactions can occur without the other major systems and components of the complete SCR System. Pl. SOF 14-18, 41, 73.

While Defendant appears to have waived the argument that the Supported SCR Catalyst Blocks are "parts" of articles under Heading 8421 (or any other heading of Chapter 84 or 85, for

---

[1]      The many different components of an AQCS, operating together, could be viewed *in toto* as a filtration or purification system; however, as Mitsubishi explained *supra*, neither the Supported SCR Catalyst Blocks nor the SCR system performs actions that would be defined as "filtering" or "purifying."

that matter), Mitsubishi is aware that the Court will make its own determination in the matter. Given this, Mitsubishi expects that, once the Court concludes that the Supported SCR Catalyst Blocks are not "filtering or purifying […] apparatus" as these terms are used in Heading 8421, HTSUS, it will necessarily examine whether the merchandise would constitute "parts" of filtering or purifying machinery and apparatus.

To that end, whether the Supported SCR Catalyst Blocks are ultimately considered "parts" of filtering or purifying machinery and apparatus under Heading 8421 is ultimately inconsequential. Mitsubishi asserts that, even if the Court finds that the Supported SCR Catalyst Blocks are most appropriately described as "parts" of filtering or purifying machinery and apparatus, the application of AUSRI 1(c) would lead the court to find that classification under Heading 3815, HTSUS, must prevail.

**B.    The Supported SCR Catalyst Blocks are *prima facie* classifiable under Heading 3815**

Mitsubishi established in its initial brief how the Supported SCR Catalyst Blocks satisfy the language of "[r]eaction initiators, reaction accelerators and catalytic preparations" provided for in HTSUS Heading 3815. *See* Pl. Brief at 19-23. Defendant, in its response brief, does not contend or disagree with Mitsubishi's assertions to that effect. To the extent Defendant denies that Supported SCR Catalyst Blocks are reaction initiators (*see* Defendant's Response to Plaintiff's Statement of Undisputed Material Facts 55), Plaintiff provides the attached declaration from Dr. Hinton (*see* Plaintiff's Exhibit 12).

Rather, Defendant advances the sole argument—aside from its reliance on the "not elsewhere specified or included" language, which we address separately—that "the terms of heading 3815 do not describe the SCR catalyst blocks in whole." Def. Brief at 23. Specifically, Defendant appears to challenge Mitsubishi's claim to Heading 3815 with the argument that it

18

"focuses only on the classification of the catalyst components contained within the SCR catalyst blocks and not on the blocks themselves." Def. Brief at 2. This argument fails on several counts.

First, Defendant's argument fails to recognize that the Supported SCR Catalyst Blocks are, *overwhelmingly*, comprised of the SCR catalyst elements. It describes the Supported SCR Catalyst Blocks in a manner that minimizes this fact; a Supported SCR Catalyst Block consists of approximately *thirteen hundred (1,300)* SCR catalyst elements, held in place by a limited number of miscellaneous structural components. The SCR catalyst elements are also the sole aspect of the Supported SCR Catalyst Blocks that perform the function of initiating and accelerating chemical reactions.

Defendant casually waves at the presence of the limited structural components—the block frame, seal bars, seal plates, protectors, and occasionally spacers—as somehow supporting its argument that Heading 3815 is inapplicable. However, Defendant made no effort in its brief to explain the significance of these parts, nor did it even provide a description of what role they perform within the Supported SCR Catalyst Blocks. As made clear in Plaintiff's Statement of Facts 56-58, these miscellaneous components do nothing but provide structure to approximately *thirteen hundred (1,300)* SCR catalyst elements that comprise the overwhelming majority—by weight, cost, value, quantity, or any other measurable metric—of the Supported SCR Catalyst Blocks. These other components do not perform any role in initiating or accelerating catalytic reactions. The mere presence of these miscellaneous structural components does not detract from, nor interfere with, the Supported SCR Catalyst Blocks meeting the terms of a "reaction initiator[], reaction accelerator[], and catalytic preparation[]."

The Explanatory Notes to Heading 38.15 provide that articles classified under Heading 3815 "fall *broadly* into two groups." The first group is generally composed of "one or more active

substances ***deposited on a support*** (known as 'support catalysts')." This part of the Explanatory Notes language, which Defendant omitted in its reference to the Explanatory Notes, clearly contemplates that Heading 3815 is not intended to be limited only to "chemical" preparations. Def. Brief at 23. In fact, nothing in the Explanatory Notes, nor in the relevant Chapter or Section Notes, specifies or implies that Heading 3815 is intended to exclude articles that are imported with supporting structural materials.

Defendant argues that, because the Supported SCR Catalyst Blocks "contain catalytic preparations," they cannot be classified under Heading 3815. Def. Brief at 23-24. Defendant offers no definition of what constitutes a "preparation," nor does it provide any support for the assertion that the blocks are not "preparations." The term "preparation" is not specifically defined in the HTSUS.  Where the term has come before this and predecessor Courts, the term has generally been defined broadly, rather than restrictively. For example, in *Orlando Food Corp. v. United States*, 140 F.3d 1437 (Fed. Cir. 1998), the Federal Circuit approached the term "preparation" as follows:

> "Inherent in the term 'preparation' is the notion that the object involved is destined for a specific use. The relevant definition from *The Oxford English Dictionary* defines 'preparation' as 'a substance specially prepared, or made up for its appropriate use or application, e.g. as food or medicine, or in the arts or sciences.'"

*Id.* at 1441. Likewise, in *United States v. Hanrahan*, 45 C.C.P.A. 120 (1958), the Court approached the term "preparation" as follows: "where the imported merchandise is a distinct and recognized article of commerce, having an individual name, and which is produced from a raw material by a definite series of steps, such merchandise is a preparation." *Id.* at 122.

Under the explanations of "preparation" provided in the *Orlando Foods* and *Hanrahan* decisions, the Supported SCR Catalyst Blocks would not fail to be described in such a manner. The blocks are "distinct and recognized articles of commerce," and they are specially prepared or

made up to be "destined for a specific use." There is nothing in the language of HTSUS Heading 3815 or the relevant Section or Chapter Notes that necessitates restricting the scope of Heading 3815 in the manner that Defendant appears to be advocating.

**C.    Defendant's Analysis Of The Sequence Of GRI Application in *Home Depot* Is False**

Defendant's reference to *Home Depot U.S.A., Inc. v. United States*, 915 F.3d 1374 (Fed. Cir. 2019) in its brief is flabbergasting. It does not speak for the principle claimed by Defendant; if anything, this caselaw supports Mitsubishi's position on this matter. *See* Def. Brief at 23, 24. The specific language that Defendant cited as key to its arguments—"that GRI 1 applies, and the succeeding GRIs are inoperative, when an article is covered in whole by a single classification heading, and that GRI 3 only applies when goods are *prima facie* classifiable under two or more headings"—was consequential to the Court of International Trade's decision that the CAFC ***vacated and remanded*** to this Court.

That case involved a tariff classification dispute over key-operated entry door knobs, for which the disputed tariff headings for comparison were HTSUS Heading 8301, covering "[p]adlocks and locks (key, combination or electrically operated), of base metal"; and Heading 8302, covering "[b]ase metal mountings, fittings and similar articles suitable for . . . doors . . . ."

The Court of International Trade had initially held that the subject articles were described "in whole" by Heading 8301, while Heading 8302 "[a]t most . . . accurately describes [only] the exterior and interior knob components of the subject articles." *Home Depot U.S.A., Inc. v. United States*, 269 F. Supp. 3d 1306, 1316 (Ct. Int'l Trade 2017). As the door knobs were purportedly described "in whole" by Heading 8301 and "in part" by Heading 8302, the Court held that Heading 8301 was applicable under GRI 1, and that a GRI 3 analysis was unnecessary. *Id.*

The Federal Circuit, on appeal, agreed that the door knobs were *prima facie* classifiable under Heading 8301. 915 F.3d at 1378. However, that was not "the end of the story." *Id.* Rather, it found that the "plain language" of Heading 8302 was broad enough to encompass door knobs that are fitted for locking mechanisms. *Id.* at 1379. Also importantly, the Federal Circuit did not find any language in the relevant Section Notes, Chapter Notes, or Explanatory Notes that would exclude such door knobs from *also* being described under Heading 8302. As such, it found that the articles are also *prima facie* classifiable under Heading 8302. *Id.* at 1379-1380.

***In summary, the Federal Circuit rejected the specific concept that Defendant is advocating here in the very case that Defendant cited in its brief.***

With more than one tariff heading being potentially applicable for the door knobs, the Federal Circuit concluded that the tariff classification of the subject articles would be determined by GRI 3(b), and remanded the case to the Court of International Trade for further consideration on that issue. *Id.* at 1380-1381. On remand, the Court of International Trade held that Heading 8302—***the heading which it initially held only described the subject merchandise "in part"***— was the correct tariff classification under a GRI 3(b) analysis. *See Home Depot United States, Inc. v. United States*, 435 F. Supp. 3d 1311, 1342 (Ct. Int'l Trade 2020).

If anything, with this distorted and incorrect reference to the *Home Depot* decision, the government here appears to be attempting to revive the long-departed "more than" doctrine of interpretation by inverting it. Here, rather than claim that the Supported SCR Catalyst Blocks cannot be classified under Heading 3815 because the additional components render them "more than" a "catalytic preparation," Defendant appears to claim that HTSUS Heading 3815 cannot apply here because the heading describes only "part" of the Supported SCR Catalyst Blocks. This Court should see through that ruse and reject it.

The "more than" doctrine was a judicially-developed doctrine from the bygone days of the Tariff Schedules of the United States ("TSUS"), which became unnecessary after the development of the HTSUS and the General Rules of Interpretation. Its demise was officially called by the Federal Circuit in its decision in *JVC Co. of Am. v. United States*, 234 F.3d 1348 (Fed. Cir. 2000). The Federal Circuit in this decision held that the GRIs "set out principles that govern classification issues without resort to judicially-developed doctrines such as the 'more than' doctrine":

> The introduction to the GRIs states that "classification of goods in the tariff schedule shall be governed by the following principles." GRI 1 then states that "classification shall be determined according to the terms of the headings and any relevant section or chapter notes." GRI 2(b) provides that "any reference in a heading to a material or substance, shall be taken to include a reference to mixtures or combinations of that material or substance." GRI 3 provides that "when, by application of rule 2(b) or for any other reason, goods are, *prima facie*, classifiable under two or more headings," they must be classified under the heading that (1) is the most specific; (2) describes the component which gives the imported good its essential character; or (3) occurs last in numerical order. This statutorily-prescribed, comprehensive, and systematic method of classification set forth in the GRIs supplants the judicially-created "more than" doctrine and precludes its applicability to cases arising under the HTSUS.

*Id.* at 1354.

Again, Mitsubishi asserts that the Supported SCR Catalyst Blocks are "preparations" that perform the functions of initiating and accelerating chemical reactions. This is, on its face, what is covered by HTSUS Heading 3815. To the extent that the presence of the block frame, protectors, seal bars, seal plate, and possibly spacers in the Supported SCR Catalyst Blocks raise any questions of relevance for tariff classification purposes, that question is addressed by GRI 2(b), which states that "[a]ny reference to goods of a given material or substance shall be taken to include a reference to **goods consisting wholly or partly of such material or substance**." (Emphasis added.) Heading 3815 covers "preparations which initiate or accelerate certain chemical processes," *see* EN 38.15, and the Supported SCR Catalyst Blocks consist – not just "partly," but overwhelmingly – of the

23

SCR catalyst elements.[2] Finally, as we discussed in our initial brief at pages 17-23, *even if* the Court concludes that the term "preparation" does not include the structural elements of the Supported SCR Catalyst Blocks, it is left with a product that is *prima facie* classifiable under two or more headings: Heading 3815 for the SCR catalyst elements (which Defendant appears to have conceded in its brief), and—possibly—some heading under Chapter 72 or 73 for the steel structural components. This invokes GRI 3, and specifically GRI 3(b), which provides that "composite goods . . . made up of different components . . . shall be classified as if they consisted of the . . . component which gives them their essential character." Unquestionably, that would be the nearly thirteen hundred (1,300) active SCR catalyst elements that make up the overwhelming majority of the Supported SCR Catalyst Blocks by any measurable metric. The Court should reject Defendant's misrepresentations of prior case law and distortions of long-deposed doctrines, and find that the Supported SCR Catalyst Blocks are *prima facie* classified under HTSUS Heading 3815.

### D.    Under AUSRI 1(c), Heading 3815 "Shall Prevail" Over The "Parts" Provision Of Heading 8421

Should this Court agree with Mitsubishi that the Supported SCR Catalyst Blocks are not properly described as "filtering or purifying […] apparatus" under Heading 8421, the comparison between headings under which the Supported SCR Catalyst Blocks are presumably *prima facie* classifiable then becomes a comparison between a "parts thereof" provision under Heading 8421 and a heading—Heading 3815—that both specifically describes the goods in question and contains the language "not elsewhere specified or included." Here, the tenets of AUSRI 1(c) mandate that

---

[2]    Defendant's reliance on *Russ Berrie & Co. v. United States* in its brief is misplaced. Def. Brief at 28-29. That case involved a product that "is assembled from seven components, only one of which" was comprised of the material considered for tariff classification purposes. 329 F. Supp. 3d 1345, 1375-76 (Ct. Int'l Trade 2018). By comparison, the SCR catalyst blocks are comprised of approximately thirteen hundred (1,300) catalyst elements—by far the vast majority of the blocks in volume, weight, size, cost, and any other measurable metric—and additional structural components that play no meaningful role in the catalyzation of nitrogen oxides.

the "parts" provision of Heading 8421 must defer to the more specific description of the Subject Merchandise in Heading 3815.

Under AUSRI 1(c), a provision for "parts" of an article would cover products that are solely or principally used as a part of such articles, but that "a provision for 'parts' or 'parts and accessories' **shall not prevail** over a specific provision for such part or accessory."

Defendant's primary argument against classifying the Supported SCR Catalyst Blocks under HTSUS Heading 3815 appears to be the inclusion of the phrase "not elsewhere specified or included" in the heading's language. *See* Def. Brief at 22-23. However, if the "elsewhere" in the Harmonized Tariff Schedule that potentially applies to the subject merchandise is a "parts" provision, that comparison invokes AUSRI 1(c).

The Federal Circuit's decision in *Sharp Microelectronics Tech. v. United States*, 122 F.3d 1446 (Fed. Cir. 1997) established the principle that, for purposes of performing an analysis under AUSRI 1(c), a tariff provision containing language akin to "not elsewhere specified" is not automatically considered to be "non-specific" when compared to a provision for "parts or accessories" of a downstream good. As explained below, Defendant has applied the principle from the *Sharp* decision in a number of cases where the *prevailing* tariff provision was a "not elsewhere specified or included" provision.

The product at issue in the *Sharp* case consisted of two pieces of glass with a layer of liquid crystal material injected between them. The only use for this product was to be incorporated into computer screens. CBP classified the product under a subheading of HTSUS Heading 9013, which provided at the time for "[l]iquid crystal devices not constituting articles provided for more specifically in other headings." The Plaintiff in that case argued that the product should be

classified under a subheading of HTSUS Heading 8473, which provided at the time for "[p]arts and accessories . . . suitable for use solely or principally with machines of headings 8469 to 8472."

On appeal, the Federal Circuit affirmed the lower court's affirmation that the subject merchandise was properly classified under Heading 9013, which prevailed over the parts provision of Heading 8473. *Id.* at 1452. Of note, the Court did not attempt to rule generally on what language constitutes a "basket" provision, or render a decision on the comparative nature between "basket" provisions and "parts" provisions. *See id.* at 1450. The Court also did not conclude that Heading 9013 was not a basket provision *because of* its inclusion of the term "specifically." *Id.* Rather, the Court concluded that Heading 9013 provided a "specific home, not a basket, for defined articles," and notes that the provision "acknowledges that the same article specifically defined therein might be found with an even more specifically described home elsewhere in the schedule." *Id.* The Court also specifically acknowledged that it was guided in its analysis by AUSRI 1(c), stating that it "further provides a tool to assist in finding the correct classification home for articles . . . for which two headings compete." *Id.* at 1452.

E.    **Defendant's Actions After The *Sharp* Decision Demonstrate That Heading 3815 Is Treated As A "Specific" Provision That Would Prevail Over a "Parts" Provision, For Purposes Of Applying AUSRI 1(c)**

Neither this Court nor the Federal Circuit appears to have been presented with the question of whether the analysis that was performed in *Sharp* would apply in a comparison between a "parts" provision and a provision containing the specific language "not elsewhere specified or included." Notwithstanding that, Defendant U.S. Customs and Border Protection has been presented that very question on numerous occasions in tariff classification ruling requests. In those cases, ***and on a consistent basis***, CBP has answered that question by using the *Sharp* analysis and the application of AUSRI 1(c) to conclude that tariff provisions containing "not elsewhere

specified or included" are "specific provisions" that shall prevail over tariff provisions for "parts" of articles. While this Court is obviously not bound to abide by the same pattern or practice of analysis that CBP has developed in its tariff classification rulings, we believe these rulings are instructive in guiding the Court to reach the same conclusion in this case as CBP consistently did in its determinations.

Some key CBP rulings addressing this question are highlighted and discussed below:

- <u>HRL 966041, dated April 29, 2003</u>:

The first case referencing the Federal Circuit's decision in *Sharp* involved the tariff classification of a sewing machine light. The competing tariff provisions were under the "parts thereof" provision of HTSUS Heading 8452 (covering sewing machines among other products) and HTSUS Heading 9405, which provided for "[l]amps and lighting fittings including searchlights and spotlights and parts thereof, ***not elsewhere specified or included***."

CBP held in this ruling that "[t]he term 'not elsewhere specified or included' ***does not render this residual provision*** [under Heading 9405] a 'basket' or non-specific provision." CBP cited the Court's language from *Sharp* stating that the provision (referring to Heading 9013) "is simply another specific provision acknowledging that it may be more or less difficult to satisfy than some other provision, or a more or less accurate or certain provision than some other to describe a particular article," *Sharp*, 122 F.3d at 1450, and held that so too is the case with Heading 9405. Heading 9405 "specifically describes lamps and lighting fittings, but acknowledges that other headings for lamps and lighting fittings may provide a more specifically described home for the merchandise at issue." Hence, CBP concluded that Heading 9405 is thus a ***specific*** provision for those lamps and lighting fittings that are not elsewhere specified or included. Between the

*Sharp* decision and the application of AUSRI 1(c), CBP concluded that Heading 9405 prevailed over the parts provision of Heading 8452 for the sewing machine lights.

- <u>HRL H071775, dated February 18, 2010:</u>

Similar to the comparison performed in HRL 966041, at issue in this Application for Further Review of a protest was whether ceiling fan light kits were more properly classified under HTSUS Heading 9405—the "not elsewhere specified or included" provision for lamps and lighting fittings discussed above—and a "parts" provision for fans under Heading 8414.

As the "parts" provision in this case is under HTSUS Section XVI, Chapter 84, as so for "parts" of filtering or purifying machinery and apparatus under Heading 8421, the protestant argued that Section Note 2(a) to HTSUS Section XVI directed the classification of parts of machines of Chapters 84 and 85 into their respective headings. This Section Note provides that "[p]arts which are goods included in any of the headings of Chapter 84 or 85 . . . are in all cases to be classified in their respective headings." However, CBP correctly stated that the competing provision for the ceiling fan light kits—under Heading 9405—are not classifiable in Chapters 84 or 85; to the contrary, they are classifiable outside of Section XVI, in Chapter 94. CBP continued that, "where we have unrestricted language as to the classification of a good classified outside Section XVI, ***Additional U.S. Rule of Interpretation (AUSRI) 1(c) provides us with the necessary guidance***."

Guided by that rule, CBP concluded that the light kits were properly classified under Heading 9405. While the agency did not explicitly cite the *Sharp* case or call attention to the "not elsewhere specified or included" language of Heading 9405 in this ruling, its conclusion and rationale clearly shows that CBP found Heading 9405 to be a "specific" provision notwithstanding the "not elsewhere specified or included" language included in that heading.

- HRL 967388, dated March 20, 2006, and HRL 967549, dated October 14, 2005:

Both rulings cited above covered different merchandise (fixed and variable attenuators in HRL 967388, optical couplers in HRL 967549) that involved a similar comparison between a different provision within Heading 9013 than that in the *Sharp* decision—"other optical appliances and instruments, not specified or included elsewhere in this chapter"—and a provision for "parts" of electrical apparatus for line telephony or line telegraphy under Heading 8517. Both rulings invoked the same language with respect to the application of the *Sharp* decision and AUSRI 1(c):

> In Sharp, supra, the Court of Appeals affirmed the Court of International Trade's (CIT) conclusion that under a relative specificity analysis, a parts provision is less specific than heading 9013, HTSUS. The CIT had looked "to the provision with 'requirements which are more difficult to satisfy and which describe the article with the greatest degree of accuracy and certainty', citing Amersham Corp. v. United States, 5 C.I.T. 49, 564 F. Supp. 813, 824 (Ct. Int'l Trade 1983)." Id. at 1449. The CIT had also applied Additional U.S. Rule of Interpretation (AUSRI) 1(c), which provides that "a provision for 'parts' or 'parts and accessories' shall not prevail over a specific provision for such part or accessory." In this case, under a relative specificity analysis, as applied in Sharp, we find that the [subject merchandise] is precisely described by heading 9013, HTSUS as "optical appliances and instruments," and heading 9013 is more difficult to meet than a parts provision. In addition, under AUSRI 1(c), the specific heading of 9013, HTSUS, is preferred over the "parts" provision. In HQ 966041, dated April 29, 2003, citing Sharp, supra, it was determined that the terms "not elsewhere specified or included" in heading 9013, HTSUS, does not render the heading a "basket" or non-specific provision. Therefore, under a relative specificity analysis, the [subject merchandise] is classified under heading 9013, HTSUS.

- HRL W967842, dated August 21, 2009:

This ruling was a revocation of a prior tariff classification ruling on an "auto-sampler" sample injector. The HTSUS provisions under consideration were under a basket provision for other "machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter" under Heading 8479, and a "parts and accessories thereof" provision under Heading 9027 (covering instruments for physical or chemical analysis). Similar to the other

CBP rulings identified herein, CBP found both the *Sharp* decision and AUSRI 1(c) to be instructive in its analysis, and CBP ultimately found the "not specified or included elsewhere" provision of Heading 8479 to prevail over the "parts and accessories" provision of Heading 9027.

As this decision was a revocation of a prior ruling, CBP issued a proposed revocation notice in the Customs Bulletin (Volume 39, Number 40, November 23, 2005) in which it sought interested party comments. The comments CBP received included notes that "the terms of heading 8479, HTSUS, require that the machines of the heading not be elsewhere specified or included." The commenters "characterize heading 8479, HTSUS, as a residual provision which cannot be considered" for comparison to a different provision. CBP, in response to these comments, stated explicitly that the term "'not elsewhere specified or included' ***does not render*** this residual provision . . . a 'basket' or non-specific provision." Similar to other cases, and using the *Sharp* decision as a guide, CBP characterized the "not elsewhere specified or included" language of Heading 8479 as "specifically describing" the subject merchandise while acknowledging that "other headings . . . may provide a more specifically described home for the merchandise at issue." Ultimately, this heading prevailed over the "parts and accessories" provision of Heading 9027.

- HRL H285929, dated August 14, 2019:

This ruling included a request for the tariff classification of certain silicone skins for security cameras. The competing tariff provisions at issue are under Heading 8529—covering "[p]arts suitable for use solely or principally with the apparatus of headings 8525 to 8528"—and Heading 3926, which covers "[o]ther articles of plastics and articles of other materials of headings 3901 to 3914." Of note here, the actual language of Heading 3926 does not include the term "not elsewhere specified or included," although the term "other" that is in the heading has often been cited as being an indicator of a "basket" provision. *See Sharp*, 122 F.3d at 1450. The Explanatory

Notes to Heading 39.26, however, introduce the heading with the statement that it "covers articles, ***not elsewhere specified or included***, of plastics." (Emphasis added.)

In what has become a common theme throughout these rulings, CBP cited AUSRI 1(c) as being instructive in its analysis. In this case, CBP stated that, before it could consider the importer's claim "that the subject silicone skins should be classified as a part of a television camera [under Heading 8529], [it] must first determine whether they are *prima facie* classifiable as [a] good of heading 3926, HTSUS." CBP concluded upon review that the silicone skins were classifiable under this heading, notwithstanding it being an "other" heading that has commonly been designated as a "basket" provision. It therefore found this heading as prevailing over the "parts" provision under Heading 8529.

These rulings share a common and consistent refrain: the inclusion of "basket-esque" language in a tariff heading does not invalidate it from consideration under AUSRI 1(c). Where an article is potentially classifiable under a "parts" provision on one side, and a tariff provision that *prima facie* directly describes the goods on the other side—even where that second tariff provision contains language such as "not elsewhere specified or included"—the provisions of AUSRI 1(c) specifies that the *prima facie* tariff heading ***shall prevail*** over the "parts" heading.

The Court, while obviously not bound to apply CBP's rationale taken from the above cited rulings, should find them instructive in its analysis. The language "not elsewhere specified or included" in Heading 3815 does not render it a "basket" provision that is ineligible for consideration under AUSRI 1(c). This heading "specifically" describes the Supported SCR Catalyst Blocks in their role as reaction initiators, reaction accelerators, and catalytic preparations. In contrast, the Supported SCR Catalyst Blocks are clearly ***not*** properly described as "filtering or

purifying […] apparatus" as these terms are used in HTSUS Heading 8421, as Mitsubishi has demonstrated herein.

While Defendant seems to have disclaimed any argument that the Supported SCR Catalyst Blocks are "parts" of articles of Heading 8421, its description of the blocks and their use within the context of a larger Air Quality Control System in its Statement of Facts seems to suggest that the *only* part of Heading 8421 that would theoretically describe the merchandise would be as "parts" of some sort. Under this landscape, the answer is clearly before the Court: By application of AUSRI 1(c), the "parts" provision of Heading 8421 "***shall not prevail***" over the "reaction initiators, reaction accelerators and catalytic preparations" provision of Heading 3815.

## IV.    The Supported SCR Catalyst Blocks Qualify For Exclusions From Section 301 Duties

Defendant relies on several unpersuasive arguments in order to disqualify the Supported SCR Catalyst Blocks from the exclusions from Section 301 duties, which rightfully apply to the Subject Merchandise after being specifically approved and granted to Plaintiff by the USTR and CBP. Specifically, the USTR, together with CBP, approved Mitsubishi's exclusion requests for plate type supported catalysts to be imported in block module form. Pl. Ex. 10, 11. The approvals resulted in the following exclusions:

- For TRAC formulation: "Plate-type supported catalysts (reaction accelerators) for reduction of nitrous oxides (NOx) with enhanced mercury oxidation, with oxides of base metals being the active substances, applied to a stainless steel mesh (described in statistical reporting number 3815.19.0000)." *See* 9903.88.46 and 9903.88.56.

- For CM formulation: "Plate-type supported catalysts (reaction accelerators) for reduction of nitrous oxides (NOx), with base metals being the active substances, applied on a titanium dioxide based ceramic material to a stainless steel mesh (described in statistical reporting number 3815.19.0000)." *See* 9903.88.46 and 9903.88.56.

Defendant alleges that exclusions, as written, do not cover the Supported SCR Catalyst Blocks because they only describe part of the product—catalyst elements (plates). Def. Brief at 27-29. Defendant also appears to suggest that original exclusion requests are irrelevant to the interpretation of the resulting exclusions. Def. Brief at 26-27.

As discussed in our brief on pages 23-29, both CM and TRAC Supported SCR Catalyst Blocks qualify for exclusions from Section 301 duties as supported by the exclusion language. Defendant concedes that exclusions cover catalyst elements (plates). Def. Brief at 28. However, Defendant takes issue with the fact that "the exclusions cover just one component of an SCR catalyst block, rather than the SCR catalyst block as a whole." Def. Brief at 28. As such, it appears that the issue with the exclusion, based on Defendant's argument, is that the exclusion language does not indicate that supported catalysts are imported in block form.

Even though the word "block" is not referenced in the resulting exclusion language, nothing in the language of the exclusions limits the application of the exclusions to catalyst elements (plates). Moreover, Plaintiff's exclusion applications clearly indicated that supported catalysts for which the exclusions were requested were to be imported in "block module form." *See* Pl. Ex. 10, 11. Plaintiff's Exhibits 10 and 11 represent the original exclusion requests submitted to the USTR by Mitsubishi for the Subject Merchandise—supported catalysts imported in block module form. The USTR, together with CBP, reviewed the exclusion requests and granted the exclusion requests. CBP was instrumental in approving the exclusion requests because CBP reviewed exclusions for administrability. Both exclusion requests were granted by the USTR and CBP, with Joseph Barloon, USTR's General Counsel, signing the approval letters on May 4, 2020. *See* Pl. Ex. 10, 11. As such, it is clear that when granting the exclusions to Plaintiff, both the USTR

and CBP clearly understood that the exclusions were to apply to the Supported SCR Catalyst Blocks (*i.e.*, supported catalysts imported in block module form).

Defendant's attempt to limit the exclusions to only cover catalyst elements (plates) fails. The exclusions are ***not*** limited to plates; they cover "plate-type supported catalysts." The USTR did not define the dimensions, characteristics, or make up of plate type supported catalysts except only to specify that "active substances" of catalysts be applied to stainless steel mesh. Use of the term "plate-type" does not indicate that only catalyst elements (plates) are covered. Rather, it means that the catalyst is applied to a stainless steel mesh, and does not necessarily have to conform to the shape of a plate to qualify for the exclusions.

Further, Defendant appears to downplay the role of the catalyst elements (plates)—which it admits are covered by the exclusion—referring to them as "just one component," and overplay the role of other miscellaneous components of the Supported SCR Catalyst Blocks. Specifically, Defendant states that "the exclusions cover only 'supported catalysts' that have been 'applied' to 'a stainless steel mesh.'" Def. Brief at 28. However, the "supported catalysts that have been applied to a stainless steel mesh" comprise catalyst elements (plates). Catalyst elements (plates) comprise eighty seven percent (87%) of the total weight of a Supported SCR Catalyst Block, while other miscellaneous components comprise the remaining thirteen percent (13%). Pl. SOF 67. There are approximately ***thirteen hundred (1,300)*** catalyst elements (plates) in each Supported SCR Catalyst Blocks. The Supported SCR Catalyst Blocks consist almost exclusively of the catalyst elements (plates). The remaining block frame, protector, seal bars, seal plate, and, depending on the application, spacers, are miscellaneous components that simply make it easier to install the catalyst elements (plates) into the SCR system. None of these miscellaneous components affect the function of the catalyst elements (plates). Pl. SOF 56. Catalyst elements (plates) function as

intended without the miscellaneous components, because it is the chemical properties—rather than physical miscellaneous components—that provide the essential function of the Supported SCR Catalyst Blocks. As such, approximately thirteen hundred catalyst elements (plates) are not "just one component" as argued by Defendant, but almost the entirety of the Supported SCR Catalyst Blocks and the only element that provides the functionality of the Supported SCR Catalyst Blocks.

Defendant also improperly attempts to prevent this Court from considering the original exclusion requests submitted by Plaintiff attached as Exhibits 10 and 11. Def. Brief at 26-27. Defendant relies on the following language in the Federal Register notices: "The scope of each exclusion […] is governed by the scope of the product descriptions in the Annex—not by the product descriptions provided in any particular request for exclusion." Def. Brief at 27. Plaintiff does not dispute that the Federal Register Notice provides the resulting language of the exclusions. However, this Court has previously established that original exclusion requests are relevant when interpreting the resulting exclusion language. *See Keystone*, 732 F. Supp. 3d at 1350 (finding that the original exclusion request filed by Polaris Inc. who was not a party to the litigation was relevant to the interpretation of the exclusion language). In this case, it is even more compelling to rely on the original exclusion requests to determine the applicability of the exclusions because the exclusion requests at issue here were submitted by Mitsubishi—Plaintiff in this case—specifically for the Subject Merchandise, while exclusion request found relevant in *Keystone* was submitted by a party not related to the litigation. Yet, this Court found it important to analyze the original exclusion request in *Keystone*.

When looking at Mitsubishi's exclusion requests in this case, it is clear that Mitsubishi intended for the exclusions—if granted—to apply to "plate type supported […] catalysts in block module form." Pl. Ex. 10, 11. The USTR, together with CBP, approved Mitsubishi's exclusion

requests based on Mitsubishi's specific descriptions in the exclusion requests. As such, it is clear that **both** the USTR and CBP understood that exclusions were being approved for "plate type supported […] catalysts in block module form," thus clearly granting exclusions for plate type supported catalysts to be imported in block module form (*i.e.*, Supported SCR Catalyst Blocks).

Defendant summarily cites two cases that purportedly support its conclusion that, "because the exclusions cover just one component of an SCR catalyst block, rather than the SCR catalyst block as a whole, they are inapplicable":

> *See, e.g., Prysm, Inc. v. United States*, 2019 WL 6332638, at *4 n.9 (Ct. Int'l Trade Nov. 26, 2019) (explaining that no inquiry into the potential applicability of Heading 8543, which covers "[e]lectrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter; parts thereof," was necessary because Heading 8528 wholly described the subject products and the parties agreed that the products were imported as complete units); *Russ Berrie & Co., Inc. v. United States*, 329 F.Supp.3d 1345, 1375–76 (Ct. Int'l Trade 2018) (Headings that "do not describe the entire article but only a part thereof" are inapplicable under GRI 1).

Def. Brief at 28-29. Neither of the cited cases discusses the applicability of Section 301 tariff exclusions and, thus, cannot be used to determine the applicability of these tariff exclusions. Tariff exclusions are neither Headings nor Subheadings. Individual tariff exclusions are published by the USTR in the Federal Register Notices that explain how exclusions must be interpreted and applied. As such, tariff exclusions cannot be reviewed under the standard classification framework like other Headings and Subheadings, because the USTR's Federal Register Notices specify that the product qualifies for the exclusion if it is capable of meeting the description of the exclusion language and does not require analysis under the GRIs or AUSRIs as *eo nomine* or principal use provisions, given that GRIs and AUSRIs are applied unless "context otherwise requires."

Because the Supported SCR Catalyst Blocks consist almost entirely of the catalyst elements (plates)—which Defendant admits qualify for the exclusions from Section 301 duties—

the catalyst elements (plates) are the only element that provides the functionality of the Supported SCR Catalyst Blocks. As both the USTR and CBP clearly understood that the exclusions were to apply to plate type supported catalysts in block module form (*i.e.*, Supported SCR Catalyst Blocks), the Supported SCR Catalyst Blocks must be eligible for the exclusions from Section 301 duties, which were approved by the USTR and CBP for Plaintiff.

### V.    CBP Must Be Equitably Estopped From Denying The Application Of Exclusions From Section 301 Duties To The Supported SCR Catalyst Blocks

Defendant misinterpreted Plaintiff's alternative remedy to mean that the USTR be directed to retroactively revise the exclusion language to indicate the correct subheading. Def. Brief at 29. Rather, this is simply one of the suggested means of achieving Plaintiff's actual alternative remedy that Defendant—here to mean CBP—"must be equitably estopped from denying the application of the exclusions to the Subject Merchandise regardless of the primary underlying classification." Pl. Brief at 28.

While misinterpreting Plaintiff's alternative remedy as requesting the Court to direct the USTR to revise the exclusion, Defendant argues that "this request is outside the scope of the Court's jurisdiction for this case." Def. Brief at 29. Defendant further cites several cases that discuss the importance of confining litigation to "the specific issue that has been protested, which is CBP's classification decision regarding the subject merchandise." Def. Brief at 29. However, the cases cited by Defendant do not support Defendant's claim that this Court lacks jurisdiction for the alternative remedy. As discussed above, Plaintiff's alternative remedy is that "Defendant must be equitably estopped from denying the application of the exclusions to the Subject Merchandise regardless of the primary underlying classification." Pl. Brief at 28. This is exactly the issue that has been protested and further described in the summons and complaint—

Defendant's (CBP's) refusal to apply exclusions from Section 301 duties to the Subject Merchandise. As such, this Court's jurisdiction is proper to review this remedy.

Further, Defendant claims that "drafting of USTR's exclusions is not a protestable decision subject to remediation through the statutory protest mechanism of 19 U.S.C. §§ 1514(a) and 1515" and "the Court lacks jurisdiction pursuant to 28 U.S.C. § 1581(a) over any claims related to USTR's drafting of the exclusions and may not grant the relief of revising the exclusion language." Def. Brief at 29-30. Again, revising the exclusion language is not a remedy itself, but simply one of the potential means of achieving the actual equitable estoppel remedy. As such, this Court has jurisdiction to order CBP to apply the exclusions from Section 301 duties to the Subject Merchandise after the USTR and CBP approved and granted these exclusions to Plaintiff.

Defendant also suggests that "Mitsubishi cannot […] expand the exclusions' scope by relying on its request, nor is Mitsubishi's role in making the request relevant to the interpretation and application of the plain language of the exclusions." Def. Brief at 30. First, Plaintiff is not attempting to expand the scope of the exclusions. By pointing this Court's attention to the original Mitsubishi's exclusion requests, Plaintiff merely clarifies what the USTR and CBP intended to cover—plate type supported catalysts in block module form—when granting Mitsubishi's request and issuing the exclusions. *See* Pl. Ex. 10, 11. Second, Defendant completely misleads the Court and ignores this Court's precedent when it states that "Mitsubishi's role in making the request [is not] relevant to the interpretation and application of the plain language of the exclusions." In *Keystone*, this Court clearly established that original exclusion requests are relevant when interpreting the resulting exclusion language even if the exclusion request was submitted by a third party not related to the litigation. *See Keystone*, 732 F. Supp. 3d at 1350. As such, in this case, it is even more compelling to rely on the original exclusion requests to determine the applicability

of the exclusions because the exclusions at issue here were specifically requested by Mitsubishi, specifically for the Subject Merchandise, while the exclusion request in *Keystone* was submitted by a party not related to the litigation. Yet, this Court found it important to analyze the original exclusion request in *Keystone*, so Mitsubishi asserts that it is no less proper for the Court to also do so here.

Defendant did not present any substantive arguments against the equitable estoppel claim other than stating as follows: "There is no evidence in the record showing a drafting error for the exclusion, and any purported error as implied by Mitsubishi (which there is none) could be attributable to Mitsubishi or any other number of considerations." Def. Brief at 30. This argument, however, does not and cannot defeat a claim of equitable estoppel, because all elements of equitable estoppel are met in this case.

Specifically, to establish an equitable estoppel claim, the party seeking to assert it must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel. *See Heckler v. Community Health Services*, 467 U.S. 51, 59 (1984). When estoppel is asserted against the government, the party must also show "affirmative misconduct" by the government. *Id.*, *see also Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000). As far as the "affirmative misconduct" element, there is no widely accepted test, but the United States Court of Appeals for the District of Columbia Circuit recently found establishing "affirmative misconduct" requires "a showing of misrepresentation or concealment, or, at least, behavior that will cause an egregiously unfair result." *Masters Pharmaceutical, Inc. v. DEA*, 871 F.3d 206, 225 (D.C. Cir. 2017) (internal citations omitted).

In this case, Defendant (the U.S. Government) misrepresented that the exclusions were granted to Plaintiff. The USTR, together with CBP, reviewed Plaintiff's exclusion requests and confirmed with letters dated May 4, 2020, that the exclusion requests pertaining to the plate type supported catalysts in block module form (*i.e.*, Supported SCR Catalyst Blocks) were granted. Pl. Ex. 10, 11. CBP was instrumental in the exclusion decision-making process, because it determined the administrability of the exclusions. The approval letters addressed to Plaintiff, after CBP reviewed the exclusions for administrability, state as follows: "I am pleased to notify you that the United States Trade Representative has determined to grant the above-referenced exclusion request…" Pl. Ex. 10, 11. Both letters were signed by Joseph Barloon, the USTR's General Counsel. However, Defendant now denies the applicability of the exclusions to the subject plate type supported catalysts in block module form regardless of having previously confirmed them in writing. As such, Defendant misrepresented that the exclusions were granted to Plaintiff in the first place.

Plaintiff reasonably relied on Defendant's approval letters (Pl. Ex. 10, 11) to maintain its manufacturing facilities and relationships in China and to continue importing the Subject Merchandise pursuant to Defendant's grant of the exclusions, expecting that the 25 percent Section 301 duties were not to be applied to its products. It is only logical to conclude that relying on an official approval letter signed by the USTR's General Counsel is reasonable.

However, Plaintiff relied on Defendant's official approval letter signed by the USTR's General Counsel to its detriment. Specifically, as a result of Defendant's refusal to honor the original grant of the exclusions to the Subject Merchandise, Plaintiff was forced to pay millions of dollars in Section 301 duties on imports of Subject Merchandise—after Plaintiff was told by the USTR's General Counsel that the merchandise had been excluded from such duties. As such, if

this Court finds that the exclusions do not apply to the Subject Merchandise, Plaintiff will lose millions of dollars paid in Section 301 duties to Defendant, after Defendant had already assured Plaintiff that the Section 301 duties are not to be paid for the Subject Merchandise. Had it not been for Defendant's refusal to apply the exclusions, Plaintiff would not have paid Section 301 duties pursuant to the grant of the exclusions already approved by Defendant.

Finally, Defendant engaged in "affirmative misconduct" when it refused to honor the original grant of the exclusions to the Subject Merchandise. Specifically, Defendant misrepresented in its May 4, 2020, official approval letters signed by the USTR's General Counsel that the exclusions were approved for the Subject Merchandsie. Such misrepresentation caused an egregiously unfair result. Specifically, it is egregiously unfair when an importer, as here, is told in writing by the Government that its imports are excluded from Section 301 duties—for the Government to then reverse its position once the products have already been imported and charge the importer millions of dollars in Section 301 duties. As such, all elements of equitable estoppel have been met against the Defendant.

As a last resort in its rebuttal of the equitable estoppel claim, Defendant states that "Mitsubishi acknowledge[d], there [was] an administrative process available to Mitsubishi for revising exclusion language to correct alleged errors" and that Plaintiff did not avail itself of this administrative process. Def. Brief 30-31. This is false. In its brief, Plaintiff simply referred to several instances where the USTR retroactively revised exclusion language to cure mistakes or omissions on its own accord. Pl. Brief at 28-29. However, ***there was never a specific administrative process to request revisions of published exclusions from the USTR***. As such, there was nothing Plaintiff could have done administratively prior to this litigation to revise the exclusions.

## VI.    Alternatively, The Catalyst Elements (Plates) Qualify For Exclusions From Section 301 Duties

If this Court finds that complete Supported SCR Catalyst Blocks do not qualify for the exclusions from Section 301 duties (which they do), this Court should find that the exclusions do cover—at a minimum—the catalyst elements (plates) that comprise the overwhelming majority of the Subject Merchandise by weight, cost, value, quantity, or any other measurable metric.

Specifically, Defendant conceded that "[a]s written, the exclusions cover […] the catalyst elements within the SCR catalyst blocks." Def. Brief at 27. As such, in the interest of justice, the exclusions—at a minimum—must be applied to the value of the catalyst elements (plates). There is no case law that prohibits such treatment of tariff exclusions.

In fact, the USTR has recently initiated an investigation of China's acts, policies, and practices related to targeting of the semiconductor industry for dominance. *See Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Targeting of the Semiconductor Industry for Dominance*, 89 Fed. Reg. 106725 (Dec. 30, 2024). The USTR's notice explains that "[t]his investigation initially will focus on PRC manufacturing of foundational semiconductors (also known as legacy or mature node semiconductors), including ***to the extent that they are incorporated as components into downstream products*** for critical industries like defense, automotive, medical devices, aerospace, telecommunications, and power generation and the electrical grid." *Id*. at 106725 (emphasis added). It follows that the USTR has adopted an approach that may result in tariffs being applied to components of imported products.

Consistent with this approach and in the interest of justice, it is only fair that at a minimum the exclusions from Section 301 duties are applied to the value of the catalyst elements (plates) within the Supported SCR Catalyst Blocks.

## VII. Conclusion

As Plaintiff demonstrated above, the Supported SCR Catalyst Blocks are properly classified under primary Subheading 3815.19.0000, HTSUS, and secondary Headings 9903.88.46 and 9903.88.56, HTSUS, thus free of any duty and/or tariff. For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's cross-motion for summary judgment, grant Plaintiff's motion for summary judgment classifying the subject merchandise under primary Subheading 3815.19.0000, HTSUS, and secondary Headings 9903.88.46 and 9903.88.56, HTSUS, (free of any duty and/or tariff), and grant Plaintiff such other and further relief as may be just and appropriate.

Respectfully submitted,

Dated:    January 17, 2025

_____
Serhiy Kiyasov, Attorney

Eric R. Rock
Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6195 (telephone)
skiyasov@rocktradelaw.com (e-mail)

*Counsel For Mitsubishi Power Americas, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Serhiy Kiyasov, hereby certify that this response/reply brief complies with the 14,000 word-count limitation of the United States Court of International Trade set forth in Standard Chambers Procedure § 2(B)(1) because this brief contains 13,828 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Respectfully submitted,

Dated: _____January 17, 2025_____

_____
Serhiy Kiyasov, Attorney

Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6195 (telephone)
skiyasov@rocktradelaw.com (e-mail)

*Counsel For Mitsubishi Power Americas, Inc.*

## CERTIFICATE OF SERVICE

I, Serhiy Kiyasov, one of the attorneys for the plaintiff, certify that copies of the Plaintiff Mitsubishi Power Americas, Inc.'s Response To Defendant's Cross-motion For Summary Judgment And Reply In Further Support Of Plaintiff's Motion For Summary Judgment, Response to Defendant's Statement of Undisputed Facts, and Exhibit 12 were served on all parties by filing a copy via CM/ECF this Friday, January 17, 2025.

Respectfully submitted,

Dated:    January 17, 2025    

_____

Serhiy Kiyasov, Attorney

Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6195 (telephone)
skiyasov@rocktradelaw.com (e-mail)

*Counsel For Mitsubishi Power Americas, Inc.*